# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 20, 2012

No. 11-40454

Lyle W. Cayce
Clerk

GARY SAWYER; DOUG KEMPF; PETER BARNABA, SR.; GEOFF
RORREV; TIM GREGORY; ET AL,

Plaintiffs - Appellants

v.

E I DUPONT DE NEMOURS & CO,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before DeMOSS, CLEMENT, and ELROD, Circuit Judges.

DeMOSS, Circuit Judge:

Appellants are sixty-three former employees of E. I. du Pont de Nemours and Company ("DuPont") who worked at the company's manufacturing facility in La Porte, Texas. They filed suit against DuPont alleging that they were fraudulently induced to terminate their employment with DuPont and accept employment with a wholly owned subsidiary. The district court granted summary judgment dismissing Appellants' claims and entered a take-nothing final judgment in favor of DuPont. For the following reasons, we affirm.

No. 11-40454

## BACKGROUND

The appellants worked in the Terathane Products Unit at DuPont's manufacturing facility in La Porte, Texas. In February 2002, DuPont announced plans to spin off a portion of its operations to form a wholly owned subsidiary to be known as DuPont Textiles and Interiors ("DTI"). The Terathane Unit was one of the units slated to be transferred to DTI, and was the only unit being transferred from the La Porte facility.

The mechanics and operators at the La Porte facility, including those in the Terathane Unit, were represented by Local 900C of the International Chemical Workers Union Council ("Union") and were employed under a single collective bargaining agreement ("CBA") between DuPont and the Union. The CBA contained a detailed seniority system and provided that employees could only be terminated or suspended for just cause. The CBA also included a provision allowing either party to cancel the agreement at anytime with 60 days' written notice. Of the sixty-three appellants in this case, fifty-nine were mechanics or operators in the Terathane Unit and were covered by the CBA when they worked for DuPont ("covered employees"). The other four appellants, Jesse Blancas, James Svoboda, Jessie Lloyd, and Tracy Hedrick-Thomas, were administrative staff or laboratory technicians in the Terathane Unit and were not covered by the CBA ("non-covered employees").

In September 2002, DuPont management and the Union began negotiations on how to handle the labor aspect of the Terathane Unit separation. Because DTI would be an independent legal entity, employees who transferred to DTI with the Terathane Unit would no longer be employed by DuPont. However, the CBA's seniority system gave employees with higher seniority the right to transfer to other units at the La Porte facility. This raised the possibility that some of the Terathane Unit employees would exercise that right in order to stay with DuPont when the Terathane Unit transferred. If that happened,

2

No. 11-40454

DuPont would need to train new operators for the Terathane Unit and could have been forced to lay off lower seniority employees in other units at the plant. DuPont considered cancelling the plant-wide CBA and bargaining for two new CBAs, one between the Union and DTI for the Terathane Unit employees, and another between the Union and DuPont for the rest of the La Porte employees, but decided against that option out of concern that it would create tension between management and labor and increase the risk of a strike.

DuPont and the Union eventually agreed on a two-phase process. During the first phase, the Terathane Unit employees would be allowed to choose whether to stay with DuPont or join DTI. The employees who stayed with DuPont would leave the Terathane Unit and transfer to another unit at the La Porte facility. Those who joined DTI would remain with the Terathane Unit and would be covered by a new CBA identical to their existing CBA, providing the same pay and benefits they received at DuPont. The second phase consisted of another round of negotiations between management and the Union, which would only be necessary if a significant number of Terathane Unit employees decided to stay with DuPont. The employees were required to make their decision between November 15 and December 16, 2002.

Between October and December 2002, DuPont management began holding meetings with the Terathane Unit employees to explain the details of the separation arrangement. These meetings were led by Phil Anderson, the Terathane Unit manager, Roslyn Cacciotti, the Terathane Unit human resources manager, and Johnny Ponder, a Terathane Unit first line supervisor. At these meetings, the Terathane Unit employees expressed concerns that DuPont might sell DTI to a third party. Many of the employees had worked for DuPont for a long time and wanted to protect their compensation and retirement packages by remaining a part of the DuPont family. Appellants allege that they were repeatedly assured that DTI would remain a part of DuPont. The parties agree

3

that Phil Anderson told the employees that a sale of DTI was "highly unlikely." Anderson used charts and graphs to show that DTI was too large to be sold because it was bigger than any of its potential buyers. He often explained, by way of analogy, that "we're the whale, and fish don't eat whales."

By the end of Phase one, virtually all of the Terathane Unit employees had signed agreements voluntarily transferring to DTI. The new CBA between DTI and the Union became effective on February 1, 2003. On April 14, 2003, DuPont announced that it was in the early stages of negotiations for the sale of DTI with a third party. The third party turned out to be Koch Industries ("Koch") and the sale was finalized roughly a year later on May 1, 2004. It was later revealed that DuPont and Koch discussed a possible sale of DTI as early as June 2002. Appellants maintain that their "pensions, pay, and benefits materially changed in a negative way" after Koch acquired DTI.[1]

On November 7, 2006, Appellants filed suit against DuPont in the United States District Court for the Southern District of Texas on the basis of diversity jurisdiction. Appellants brought state-law claims of fraud, fraudulent inducement, and fraud by omission, alleging that DuPont fraudulently misrepresented that DTI would not be sold and that they relied on those misrepresentations and suffered damages as a result. On September 3, 2010, the district court granted summary judgment dismissing appellants John Clark's and Tony Dahlquist's claims, holding that they are barred by the statute of limitations. On February 3, 2011, the district court filed two opinions granting summary judgment against all remaining plaintiffs. The court concluded that Appellants were at-will employees when they worked for DuPont and are therefore unable to assert fraud claims against DuPont under Texas law. Appellants timely appealed.

---

[1] The Terathane Unit employees received the same pay and benefits at DTI that they received at DuPont until DTI was purchased by Koch.

No. 11-40454

## STANDARD OF REVIEW

This court reviews the grant of summary judgment de novo, applying the same standard used by the district court. *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 233 (5th Cir. 2009). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* (quoting *Hamilton*, 232 F.3d at 477). When determining whether a fact issue exists, the court views "the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

Because jurisdiction in this case is based on diversity, we apply the substantive law of the forum state. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Accordingly, Texas law applies to this appeal. We look to final decisions of the Texas Supreme Court to determine issues of Texas law. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010). "In the absence of such . . . decision[s], we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case." *Id.* (quoting *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009)). "In making an *Erie* guess, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the higher court of the state would decide otherwise." *Cerda v. 2004-EQR1*

No. 11-40454

*L.L.C.*, 612 F.3d 781, 794 (5th Cir. 2010) (quoting *Mem'l Hermann Healthcare Sys., Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008)).

## DISCUSSION

Appellants argue that the district court erred in concluding that they were at-will employees under Texas law when they worked for DuPont and that they are therefore barred from bringing Texas fraud claims against their former employer. Appellants John Clark and Tony Dahlquist, who were both covered employees while at DuPont, additionally argue that the district court erred in dismissing their claims as barred by the statute of limitations.

At-will employees in Texas are precluded from bringing fraud claims against their employers for loss of their employment. *See Cahak v. Rehab Care Group, Inc.*, No. 10-06-00399-CV, 2008 Tex. App. LEXIS 6011, at *7 (Tex. App.—Waco Aug. 6, 2008, no pet.) ("An at-will employee's claim for fraudulent inducement is . . . precluded as a matter of law."); *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 381 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("This court has held that an at will employee is barred from bringing a cause of action for fraud against his employer based upon the employer's decision to discharge the employee." (internal quotations omitted)); *see also Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 379 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Crow v. Rockett Special Util. Dist.*, 17 S.W.3d 320, 329-30 (Tex. App.—Waco 2000, pet denied), *overruled on other grounds by Binur v. Jacobo*, 135 S.W.3d 646, 651 n.11 (Tex. 2004). The question becomes whether Appellants' employment at DuPont was sufficiently non-at-will under Texas law to support

No. 11-40454

Texas fraud claims against their former employer.[2] We consider the covered and non-covered employees' employment status at DuPont in turn.

1. Covered Employees

Employment in Texas is presumed to be at-will. *Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex. 2002). An at-will employee may be discharged for "good cause, bad cause, or no cause at all." *Id.* (quoting *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998)). To overcome the at-will presumption "the employer must 'unequivocally indicate a definite intent . . . to be bound not to terminate the employee except under clearly specified circumstances.'" *Id.* (quoting *Brown*, 965 S.W.2d at 502); *see also Talford v. Columbia Med. Ctr. at Lancaster Subsidiary, L.P.*, 198 S.W.3d 462, 464 (Tex. App.—Dallas 2006, no pet.).

The covered employees argue that they were not at-will when they worked for DuPont because they were employed under a CBA that contained a seniority system and that provided that they could be discharged only for just cause. They argue that the just cause and seniority provisions constituted clear and specific restrictions limiting DuPont's ability to terminate their employment, thereby altering the at-will presumption. DuPont argues that the covered employees were at-will under Texas law because the CBA contained a provision allowing either party to cancel the agreement at anytime with 60 days' written notice.

We did not find a Texas Supreme Court opinion addressing whether a CBA that limits an employer's ability to discharge its employees, but can be cancelled with notice, alters the at-will presumption in Texas, and the cases cited by the dissent do not address this question nor do they indicate that a CBA will always

---

[2] We note that Appellants' claims are not based on any alleged violation of the CBA. If they were, federal law would control and Appellants' employment status under Texas law would not be at issue. *See United Paperworkers Int'l Union v. Champion Int'l Corp.*, 908 F.2d 1252, 1256 (5th Cir. 1990).

7

No. 11-40454

overcome Texas's strong at-will presumption. However, Texas appellate courts have held that employment agreements that limit the employer's ability to discharge for just cause, but allow the employer to terminate the agreement at anytime with notice, create an at-will employment relationship. In *Hussong v. Schwan's Sales Enterprises*, 896 S.W.2d 320, 322 (Tex. App.—Houston [1st Dist.] 1995, no writ), the appellant sued his former employer for breach of an employment agreement with terms similar to the CBA in this case. The agreement was for a fixed term of employment, which in Texas means that the employee can only be discharged for good cause, but also included a provision allowing either party to cancel the agreement with 30 days' written notice. *Id.* at 322, 324–25; *see also Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 578 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("When [a] contract of employment is for a term, as opposed to 'at will,' the employer has the burden of showing good cause for the discharge."). The court held that despite its good cause component, the employment agreement created an at-will employment relationship because it allowed the employer to cancel the agreement at any time with written notice. *Hussong*, 896 S.W.2d at 325. Other Texas appellate courts have held the same way. *See, e.g., Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 117–18 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that a term employment agreement that could be cancelled by either party with notice created an at-will employment relationship); *see also McGee v. Abrams Tech. Servs.*, No. 01-06-00590-CV, 2008 Tex. App. LEXIS 1616, at *9 (Tex. App.—Houston [1st Dist.] Mar. 6, 2008, no pet.) ("A contract that contains a stated term of employment but also contains an unambiguous voluntary termination clause does not 'unequivocally indicate' an intent to alter the at-will employment relationship."); *C.S.C.S., Inc. v. Carter*, 129 S.W.3d 584, 591 (Tex. App.—Dallas 2003, no pet.) ("A contract of employment for a term may still be at-will if the agreement allows termination for any reason.").

8

No. 11-40454

Lacking a Texas Supreme Court case directly on point, we are forced to make an *Erie* guess as to whether the CBA in this case altered the Texas at-will presumption. *See Chaney*, 595 F.3d at 229. We defer to the Texas appellate courts and conclude that the 60 day termination clause rendered the covered employees' employment with DuPont at-will for the purposes of Texas law. Accordingly, they may not bring fraud claims against DuPont for loss of their employment. *See Miller*, 229 S.W.3d at 381. Because this issue is dispositive as to appellants Clark and Dahlquist's claims, we need not consider the statute of limitations issue.

2. Non-covered Employees

The non-covered employees argue that DuPont made oral agreements restricting its ability to terminate their employment and that these agreements were sufficient to modify their at-will status. Specifically, they allege that DuPont agreed: (1) not to terminate their employment without cause; (2) to adhere to a progressive discipline policy before their employment was terminated; and (3) to provide seniority rights that protected their employment in the event of layoffs. DuPont argues that the alleged agreements lack the specificity necessary to alter the presumed at-will employment relationship.

In *Brown*, 965 S.W.2d 501, the plaintiff filed suit alleging that her employer breached an oral employment agreement not to fire her without good cause. She alleged: "At the time I was hired as well as during my employment, I was told by [the hospital administrator] that I would be able to keep my job at the Hospital as long as I was doing my job and that I would not be fired unless there was a good reason or good cause to fire me." *Id.* at 502. The issue was whether the employer's oral assurance was adequate to modify the plaintiff's at-will employment status. The Texas Supreme Court, accepting plaintiff's allegation as true, concluded that it was not.

9

No. 11-40454

General statements like those made to Brown simply do not justify the conclusion that the speaker intends by them to make a binding contract of employment. For such a contract to exist, the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances. General comments that an employee will not be discharged as long as his work is satisfactory do not in themselves manifest such an intent. Neither do statements that an employee will be discharged only for "good reason" or "good cause" when there is no agreement on what those terms encompass. Without such an agreement the employee cannot reasonably expect to limit the employer's right to terminate him. An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances.

*Id.* The court went on to note that "[i]t would be unusual . . . for oral assurances of employment for an indefinite term to be sufficiently specific and definite to modify an at-will relationship." *Id.* at 503.

*Brown* makes clear that while an oral agreement can modify an employee's at-will status, to do so it must unequivocally indicate the employer's "definite intent to be bound not to terminate the employee except under clearly specified circumstances." *Id.* at 502; *see also Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (reaffirming the holding in *Brown*). "To determine if particular oral statements manifest the required intent, courts consider both the context in which the statements were made and the language employed." *Wal-Mart Stores, Inc. v. Guerra*, No. 04-08-00146-CV, 2009 Tex. App. LEXIS 4955, at *11–12 (Tex. App.—San Antonio July 1, 2009, pet. denied).

The strongest evidence in support of the alleged oral agreements are the non-covered employees' affidavits, all of which provide as follows:

During my employment with DuPont, I understood that I could not be terminated for any reason or no reason. Specifically, I understood that I could only be terminated on the basis of a reason directly related to my work performance. In addition, if a work-related

10

No. 11-40454

reason existed, I understood that I could only be terminated after the company's progressive discipline policy was followed.

I also understood that I was protected from termination by my seniority. For example, in the event of a lay-off, I understood I could not be laid off unless everyone less senior to me was laid off. Similarly, I understood that if I elected not to transfer to DTI, I would retain my position at DuPont, and someone less senior than me would be laid off. To be clear, I understood that by virtue of my seniority, I would not lose my position at DuPont if I elected not to transfer to DTI.

My understanding of these items comes exclusively from what I was told by DuPont management during the years of my employment with DuPont.

The affidavits provide no information as to the context of the agreements or the specific language that was used. Nor do they explain when the agreements were made, who they were made with, or whether the person making the agreement had the authority to do so. Appellants also provide no evidence of a separate "progressive discipline policy" for non-covered employees. Rather, they assert that under the alleged agreement, the policy that applied to covered employees applied to them, too.

Lacking any evidence as to the specific language or context of the agreements, the non-covered employees have failed to raise a fact issue as to whether DuPont indicated a definite intent to be bound not to terminate their employment except under clearly specified circumstances. *See Brown*, 965 S.W.2d at 502; *see also Friend v. CB Richard Ellis, Inc.*, No. 2-08-306-CV, 2009 Tex. App. LEXIS 1189, at *6–7 (Tex. App.—Fort Worth Feb. 19, 2009, no pet.). Accordingly, the non-covered employees were at-will employees when they worked for DuPont and may not bring fraud claims against the company for loss of their employment.

11

No. 11-40454

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

No. 11-40454

JENNIFER WALKER ELROD, Circuit Judge, dissenting in part:

An employee either is or is not at-will. There is no such thing as somewhat at-will, or as the majority puts it "sufficiently non-at-will." In fact, the majority's conclusion brings to mind Miracle Max's diagnosis that Westley was "mostly dead." See Princess Bride (20th Century Fox released Sep. 25, 1987).[1] Here, the collective bargaining agreement unreservedly limits DuPont's ability to fire employees "except for just cause." The covered employees are not at-will.[2] I respectfully dissent.

At-will employment in Texas means the employee may be fired "for good cause, bad cause, or no cause at all." Montgomery Cnty. Hosp. Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998). Texas law presumes employment is at-will unless the employer "unequivocally indicate[s] its intent to be bound not to terminate the employment except under clearly specified circumstances." Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones, 92 S.W.3d 486, 488 (Tex. 2002). It is difficult to conceive of a more unequivocal indication of intent than what DuPont exhibited in the CBA section entitled "Discharge or Disciplinary Suspension," which states: "The PLANT agrees that no employee will be discharged or given a disciplinary suspension except for just cause." Indeed, the CBA outlines a detailed grievance procedure whereby fired employees may contest their termination as "an unjust discharge."[3] This would

---

[1] *Inigo Montoya*: He's dead. He can't talk.

  *Miracle Max*: Whoo-hoo-hoo, look who knows so much. It just so happens that your friend here is only mostly dead. There's a big difference between mostly dead and all dead. Mostly dead is slightly alive. With all dead, well, with all dead there's usually only one thing you can do. . . . Go through his clothes and look for loose change.

[2] I agree with the majority that the non-covered employees are at-will and that the summary judgment as to those appellants should be affirmed.

[3] The "Discharge or Disciplinary Suspension" section provides:
An employee, who believes he has been unjustly discharged, shall be allowed

No. 11-40454

be nonsensical if DuPont could fire the covered employees for good cause, bad cause, or no cause at all.[4]

In spite of this unambiguous contract, the majority makes an *Erie* guess that Texas courts would conclude the CBA created an at-will relationship. In doing so, the majority ignores numerous cases where similar CBAs overcame the at-will presumption. For example, Texas courts have held that CBAs that limit discharge to just cause and provide grievance procedures do *not* create at-will employment. *See Fort Worth Transp. Auth. v. Thomas*, 303 S.W.3d 850, 858–59 (Tex. App.—Fort Worth 2009, pet. denied); *Simmons Airlines v. Lagrotte*, 50 S.W.3d 748, 751–53 (Tex. App.—Dallas 2001, pet. denied). Fifth Circuit cases are in accord. *See, e.g.*, *Weber Aircraft Inc. v. Gen. Warehousemen and Helpers Union*, 253 F.3d 821, 823 (5th Cir. 2001) ("Under those provisions, to find in favor of Weber's suspension or discharge of an employee, the arbitrator has to find that Weber had just cause for the particular disciplinary action taken."); *Six Flags Over Tex., Inc. v. Int'l Bhd. of Elec. Workers*, 143 F.3d 213, 214–15 (5th Cir. 1998) (same); *Gulf Coast Indus. Workers Union v. Exxon Co.*, 70 F.3d 847, 849 (5th Cir. 1995) (same); *Trahan v. Bellsouth Telecomm., Inc.*, 71 F.3d 876, *1 (5th Cir. 1995) (same).

---

ten (10) calendar days, from the date of notification of discharge, in which to register a complaint with the PLANT. A complaint alleging an unjust discharge may be processed under Article VI, Adjustment of Grievances, beginning with the third step; or under Article VII, Arbitration; or both. If it is agreed or determined that an employee has been unjustly discharged, the PLANT will reinstate without loss of seniority and compensate such employee for lost earnings at his regular rate of pay based on his regular work schedule in effect prior to the discharge, provided, however, such period of payment shall not exceed six (6) months.

[4] Other CBA provisions also become inexplicable if covered employees could be fired for any reason. For example, "[d]uring the first nine (9) months of employment a new employee will be subject to demotion, transfer, or termination by the PLANT and such action shall not be subject to the terms of this Agreement." If all covered employees were at-will, then the CBA would not distinguish the ability to fire new employees within their first nine months.

14

No. 11-40454

Nevertheless, the majority believes that the CBA's generic "evergreen" provision—that the "Agreement shall continue in full force and effect until terminated by either party with at least sixty (60) calendar days' notice in writing"—somehow renders the covered employment at-will.[5] This is incorrect.

To begin with, the majority relies on a flawed assumption: that DuPont would be free to fire the covered employees for any reason by simply terminating the CBA with its protections. This ignores the fact that even if the CBA were terminated, federal law imposes an obligation on DuPont to maintain the grievance procedures as the status quo until post-contract negotiations reach an impasse[6]—hardly the at-will freedom to fire someone "for good cause, bad cause, or no cause at all." *Brown*, 965 S.W.2d at 502. Moreover, similar evergreen provisions are standard in CBAs, and the notice language here simply restates the requirements already imposed by federal law. *See Commc'ns Workers of Am. v. Sw. Bell Tel. Co.*, 713 F.2d 1118, 1122–23 (5th Cir. 1983) (noting the federal law requirement that parties must provide sixty days' notice before terminating a CBA). Not surprisingly, the majority can cite to no case where a CBA with such a standard notice provision only created at-will employment.

---

[5] Unlike the above just cause protections in the section entitled "Discharge or Disciplinary Suspension," the evergreen provision appears much later in the CBA under the heading "Scope and Life of Agreement."

[6] *See Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 543 n.5 (1988) ("If the parties were indeed at an impasse, then the employer's statutory duty to maintain the status quo during postcontract negotiations . . . would end."); *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965) ("[W]e hold that an employer violates neither § 8(a)(1) nor § 8(a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays of his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position."); *see also United Steelworkers of Am. v. ASARCO, Inc.*, 970 F.2d 1448, 1452 (5th Cir. 1992); *Elec. Mach. Co. v. NLRB*, 653 F.2d 958, 963 (5th Cir. 1981) ("'Impasse' within the meaning of the federal labor laws presupposes a reasonable effort at good faith bargaining which, despite noble intentions, does not conclude in an agreement between the parties." (quoting *NLRB v. Big Three Indus., Inc.*, 497 F.2d 43, 48 (5th Cir. 1974)).

No. 11-40454

Next, the majority cites to a few Texas cases that supposedly answer our *Erie* question, but those cases are inapposite. Importantly, not one of them dealt with a CBA, and therefore could not overrule the above Texas case law where CBAs overcame the at-will presumption. Rather, these cases involved employment contracts with individuals that expressly allowed the employer to fire the worker for any reason with sufficient notice. For example, in *Hussong*, the employment contract allowed the employer to fire the employee immediately under certain circumstances or "without cause" if the employer gave thirty days' notice. *Hussong v. Schwan's Sales Enters.*, 896 S.W.2d 320, 322 (Tex. App.—Houston [1st Dist.] 1995, no writ). *See also Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 117 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (finding at-will employment because the contract allowed the employer to terminate the employee's contract with thirty days' notice "at any time and for any reason"). By relying on cases with employment contracts with individual employees, the majority misses the distinction between terminating a CBA (after which covered employees continue to work) and terminating an employee (after which that person is fired).[7]

In making the *Erie* guess, I believe Texas courts would follow the Texas and federal case law where similar CBAs did not create at-will employment. The majority strains inapposite cases to arrive at a strange result: a CBA that expressly limits discharge "except for just cause" actually creates an at-will relationship merely because it includes a boilerplate notice provision that recites the federal law requirements for terminating a CBA. For these reasons, I respectfully dissent in part.

---

[7] Even DuPont does not argue that the mere act of terminating the CBA would fire the covered employees, merely contending that the CBA's termination would allow DuPont to bargain for a new CBA.

No. 11-40454